**Slip Op. 15-104**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

_____
|                                          |   |                                  |
|------------------------------------------|---|----------------------------------|
| APPVION, INC.,                           | : |                                  |
|                                          | : |                                  |
|     Plaintiff,       | : | Before: Nicholas Tsoucalas,      |
|                                          | : |     Senior Judge |
|   v.                           | : |                                  |
|                                          | : | Court No.: 14-00143              |
| UNITED STATES,                           | : |                                  |
|                                          | : | PUBLIC VERSION                   |
|     Defendant,       | : |                                  |
| And                                      | : |                                  |
|                                          | : |                                  |
| PAPIERFABRIK AUGUST KOEHLER SE,          | : |                                  |
|                                          | : |                                  |
|     Defendant-Intervenor. | : |                             |
|                                          | : |                                  |
_____

**OPINION**

[Plaintiff's Motion for Judgment on the Agency Record is denied and Commerce's Final Results are affirmed.]

Dated: September 17, 2015

Gilbert B. Kaplan and Daniel L. Schneiderman, King & Spalding LLP, of Washington, D.C., for Plaintiff.

Joshua E. Kurland, Trial Attorney, U.S. Department of Justice, Commercial Litigation Branch, of Washington, D.C., for Defendant. With him on the brief were Reginald T. Blades, Jr., Assistant Director, Jeanne E. Davidson, Director, and Benjamin C. Mizer, Principal Deputy Assistant Attorney General. Of counsel on the brief was Nanda Srikantaiah, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, D.C.

F. Amanda DeBusk and Matthew R. Nicely, Hughes Hubbard & Reed LLP, of Washington, D.C., for Defendant-Intervenor.

**Tsoucalas, Senior Judge:** This case concerns the Defendant United States Department of Commerce's ("Commerce") Final Results of the fourth administrative review ("AR4") of the antidumping order on lightweight thermal paper ("LWTP") from Germany. Lightweight Thermal Paper From Germany: Final Results of Antidumping Duty Administrative Review; 2011-2012, ("Final Results") 79 Fed. Reg. 34,719 (June 18, 2014); Issues and Decision Memorandum for the 2011-2012 Final Results of the Administrative Review on Lightweight Thermal Paper from Germany, ("IDM for AR4") A-428-840, (June 11, 2014). The period of review ("POR") is November 1, 2011, through October 31, 2012. Final Results, 79 Fed. Reg. at 34,719.

Plaintiff, Appvion Inc., ("Appvion") filed the instant suit disputing Commerce's determination that certain sales were within the ordinary course of trade and that the application of Adverse Facts Available ("AFA") was not warranted. Compl., June 19, 2014, ECF No. 7. Appvion has filed a Motion for Judgment on the Agency Record. Pl.'s Mot. for J. on the Agency R. ("Pl.'s Br."), Dec. 22, 2014, ECF No. 28. Commerce and Defendant-Intervenor, Papierfabrik August Koehler SE ("Koehler" or "Defendant-Intervenor") oppose Appvion's Motion. Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. Upon Agency R. ("Def.'s Br."), May 29, 2015, ECF No. 39; Def.-Intervenor's Resp. in Opp'n to Pl.'s Rule 56.2 Mot. for J. on the Agency R., May 28, 2015, ECF No. 36.

For the following reasons, Appvion's Motion for Judgment on the Agency Record is denied, and Commerce's Final Results are affirmed.

## BACKGROUND

Appvion is a manufacturer of domestic like product and participated in the review that gave rise to the Final Results. Compl. at ¶4. Koehler is a foreign exporter/producer of LWTP in Germany, whose paper was subject to a 6.50% weighted average dumping margin pursuant to the Antidumping Duty Orders: Lightweight Thermal Paper From Germany and the People's Republic of China, 73 Fed. Reg. 70,959, 70,959-60 (Nov. 24, 2008).

A brief synopsis of the third administrative review ("AR3") is necessary to place the instant review in context. In AR3, Koehler engaged in a fraudulent transshipment scheme where it sold 48-gram thermal paper that was destined for consumption in Germany through various intermediaries in third countries, in order to manipulate prices of paper shipped directly to its German customers. Issues and Decision Memorandum for the Final Results of the 2010-2011 Administrative Review on Lightweight Thermal Paper from Germany ("IDM for AR3") at 2, A-428-840, Apr. 10, 2013. The manipulated prices would affect the calculation of normal value that would be used in determining the antidumping margin. Id. Koehler did not voluntarily disclose the transshipment scheme during AR3. Id. at 12. Koehler discontinued the transshipment scheme on [[           ]]. Pl.'s Confidential App. Koehler's

Supplemental Resp. at 25, May 15, 2013, ECF No. 30. As a result, Commerce applied total AFA to Koehler in AR3. IDM for AR3 at 6. Commerce's decision was affirmed by this Court. Papierfabrik August Koehler SE v. United States, 38 CIT ___, 7 F.Supp.3d 1304 (2014), appeal filed and docketed, Papierfabrik August Koehler SE v. United States, Appeal No. 15-1489 (Fed. Cir. Mar. 25, 2015).

In AR4, however, Koehler acknowledged that the transshipments began prior to the POR and ended during AR4. Pl.'s Confidential App., Koehler Section A Response at 15-17, Feb. 25, 2012. In contrast to AR3, in AR4 Koehler fully disclosed the transshipment sales channel, Channel 2, and its related sales data in its reporting of home market sales during AR4. See id. at 15-17, 24, and Ex. A-7. Koehler sold LWTP through three sales channels to its German customers during AR4: Channel 1 (direct shipments), Channel 2 (transshipped sales), and Channel 3 (consignment sales). IDM for AR 4, at 3.

During AR4, Appvion contended that sales of KT 48 (a grade of thermal paper) products through Channels 1 and 3 were outside the ordinary course of trade. Id. Appvion claimed that the sales were made at artificial prices that were "aberrationally low and not determined by commercial considerations nor market-based supply and demand, in part because of the particular manner in which Koehler established prices for these sales." Id. Appvion also argued that the application of AFA was warranted. Id. at 18.

In the Final Results, Commerce determined that the sales were not outside the ordinary course of trade and concluded that Koehler did not make sales of subject merchandise at less than normal value. Id. at 6-7; Final Results 79 Fed. Reg. at 34,719. Accordingly, Commerce found that Koehler's LWTP was subject to a zero percent weighted-average dumping margin for the POR. Final Results 79 Fed. Reg. at 34,720. Furthermore, Commerce found no basis to apply AFA. IDM for AR4 at 19. Appvion filed the instant action disputing Commerce's Final Results and a Motion for Judgment on the Agency Record. Compl. at 1-6; Pl.'s Br. at 1-45.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) (2012), and section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012).[1]

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456, 462 (1951)(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938)).  To determine if substantial evidence exists, the court reviews the record as a whole, including whatever "fairly detracts from its weight." Id. at 488, 71 S.Ct. at 464, 95 L.Ed. at 467.  The mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial evidence.  Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); see also Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 141 (1966).

**DISCUSSION**

**1. Ordinary Course of Trade**

Antidumping duties are equal to the "amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673.  The antidumping statute defines normal value as the price of the subject merchandise "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price," 19 U.S.C. § 1677b(a)(1)(A), where the price is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade . . . ." 19 U.S.C.

§ 1677b(a)(1)(B)(i). In order for Commerce to include particular sales in its calculation of normal value, the sales must have been made in the ordinary course of trade. U.S. Steel Corp. v. United States, 37 CIT ____, 953 F.Supp.2d 1332, 1341 (2013). In turn, the "ordinary course of trade" means:

> the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:
>
> (A) Sales disregarded under section 1677b(b)(1) of this title [sales below the cost of production].
>
> (B) Transactions disregarded under section 1677b(f)(2) of this title [sales between affiliated persons where the amount representing the element of value does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration].

19 U.S.C. § 1677(15). Other than for the aforementioned subsections (A) and (B), the Tariff Act provides "little assistance in determining what is outside the scope of that definition." NSK Ltd. v. United States, 25 CIT 583, 599, 170 F.Supp.2d 1280, 1296 (2001). The Court has held that "the statutory provision defining what is considered outside the ordinary course of trade is unclear." Id. Accordingly, the Court has found that Commerce has discretion to determine what sales are outside the ordinary course

of trade.  U.S. Steel, 37 CIT at ____, 953 F.Supp.2d at 1341. Commerce may consider sales or transactions to be outside the ordinary course of trade "if . . . based on an evaluation of all of the circumstances particular to the sales in question, that such sales or transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. § 351.102(b)(35) (2015).  Examples of sales that Commerce might consider as being outside the ordinary course of trade are sales or transactions involving off-quality merchandise or merchandise produced according to unusual product specifications, merchandise sold at aberrational prices or with abnormally high profits, merchandise sold pursuant to unusual terms of sale, or merchandise sold to an affiliated party at a non-arm's length price. Id. In determining whether home market sales are in the ordinary course of trade, Commerce must "evaluate not just 'one factor taken in isolation but rather . . . all the circumstances particular to the sales in question.'" Cemex, S.A. v. United States, 133 F. 3d 897, 900 (Fed. Cir. 1998) (quoting Murata Mfg. Co. v. United States, 17 CIT 259, 264, 820 F.Supp. 603, 607 (1993)).  "In applying its totality of the circumstances test, Commerce does not give particular weight to any single factor.  Instead, Commerce determines which factor may be more or less significant based on the case at hand." U.S. Steel, 953 F. Supp.2d at 1342 (citing Murata, 17 CIT at 263, 820 F.Supp. at 606). "An analysis of these

factors should be guided by the purpose of the ordinary course of trade provision which is 'to prevent dumping margins from being based on sales which are not representative' of the home market." Id. (quoting Monsanto Co. v. United States, 12 CIT 937, 940, 698 F.Supp. 275, 278 (1988)).

Very low prices or profits may be indicative of sales outside the ordinary course of trade; however, the mere fact of such low prices or profits does not necessarily mean that such sales are outside the ordinary course of trade, as Commerce must evaluate all the circumstances particular to the sales in question. See Cemex, S.A. v. United States, 19 CIT 587, 592, (not reported in Federal Supplement) (1995), aff'd, Cemex, S.A. v. United States, 133 F.3d at 900; see also, NTN Bearing Corp. of America, 25 CIT 664, 681, 155 F.Supp.2d 715, 732 (2001), rev'd on other grounds sub nom. Fag Italia S.p.A. v. United States, 402 F.3d 1356 (2005).

Commerce's decision is "entitled to deference from this Court." Mantex, Inc. v. United States, 17 CIT 1385, 1403, 841 F. Supp. 1290, 1306 (1993). "The Plaintiff has the burden of proving whether sales used in Commerce's calculations are outside the ordinary course of trade or not . . . ." Nachi-Fujikoshi Corp. v. United States, 16 CIT 606, 608, 798 F. Supp. 716, 718 (1992).

Appvion argues that direct sales of matching 48 gram products were outside the ordinary course of trade and should not have been included in the calculation of normal value, because the

sales had extraordinary characteristics. Pl.'s Br. at 9. Appvion argues that the sales were exceptional and should be excluded, because they were the only sales vetted through [[

]] to eliminate dumping. Id. at 10. Appvion further contends that the sales were outside the ordinary course of trade, because they were made at artificially low prices or profit levels, while higher market-priced sales were concealed through transshipments (Channel 2). Id. at 9-10. Appvion calls this Koehler's "two-tier pricing mechanism." Id. at 19. Appvion came to this conclusion by aggregating sales between Channels 1 (direct shipments) and 3 (consignment sales) and comparing them against Channel 2 (transshipped sales). Def.'s Br. at 10.

Commerce contends that when the sales are disaggregated, it did not find "aberrationally low" profits earned on Channel 1 and 3 sales, rather, it found that variations in price and profitability were due to market factors as opposed to the transshipment scheme. Id. at 11. Appvion does not point to any authority questioning the reasonableness of Commerce's decision to disaggregate the channels. Pl.'s Br. at 1-44. Accordingly, the court finds that Commerce's decision to disaggregate the channels was reasonable given that Koehler identified them as separate sales channels. Pl.'s Confidential App. Koehler's Resp. to Section A Questionnaire at 15, Feb. 25, 2012.

Appvion argues that sales of the 55-gram product (another grade of LWTP) "form a commercial benchmark" against which to evaluate Koehler's pricing for the matching product. Pl.'s Br. at 14. Appvion assumes that sales of the "48-gram product would carry a substantial price premium (on a per weight basis) over sales of a 55-gram product, because one kilogram of the 48-gram product has 15% more square meters of paper than one kilogram of the 55-gram product." Id. Nevertheless, Commerce properly considered various factors that may explain the difference in price: there is "significant demand" for KT 55 products in Koehler's home market, as the KT 55 product is thicker and stronger; transport costs are [[

]]; and [[                              ]] for the KT 55 product allow for [[                                   ]]. Def.'s Br. at 23-24. Thus, Commerce cited evidence in the record showing that pricing patterns may be influenced by a variety of factors. See id. Accordingly, Commerce's decision not to use KT 55 as a commercial benchmark was reasonable and supported by substantial evidence.

Appvion further alleges that a dramatic price increase among Channels 1 and 3 direct sales after the transshipment scheme ended in June 2012 confirms that the sales at issue were made outside the ordinary course of trade. Pl.'s Br. at 14-15. The court disagrees. When the sales were disaggregated, Commerce did

not find a dramatic price increase after the transshipment scheme ended.  Pl.'s Confidential App. Price and Profitability Analysis at Fig. 2, June 11, 2014.

Further, after the transshipment scheme was discontinued in [[        ]] Channel 1 prices [[        ]] only in [[        ]], which is [[              ]] after the scheme was discontinued.  Id. at 3.  This suggests that the price increase was not connected to the transshipment scheme.  See id.  There is a consistency in prices between Channels 2 and 3, as the Channel 3 customer replaced the [[        ]] Channel 2 customer after the transshipment scheme ended in [[        ]].  See id. at Fig. 2.  The prices were similar both during and after the transshipment scheme ended in [[        ]].  See id. Correspondingly, Channel 1 sales were made to [[              ]] and showed more variation in price. See id. at 5. This suggests that the price differences between sales could be attributed to [[              ]].  See id.

Appvion counters that Channel 3 (consignment) sales are irrelevant to its ordinary course of trade argument, because [[              ]] of matching 48-gram products during the transshipment period. Pl.'s Br. at 25.  Appvion's argument, however, is inconsistent, because it claims that Channel 3 sales are irrelevant, yet it argues for an aggregated price analysis of Channels 1 and 3. Id. at 21, 25. Channel 3 sales are

relevant, because they relate to Appvion's claim of a dramatic increase in price when the transshipment scheme was discontinued.

Commerce's disaggregated profitability analysis reveals that "Channel 1 profits, while ranging from [[

]] than the Channel 2 profits, were not so different as to be 'aberrational.'" Pl.'s Confidential App. Price and Profitability Analysis at 8.

The court finds that Commerce's profitability analysis was reasonable. See id. Even assuming arguendo that the sales were made at abnormally low prices and profits, the sales are not necessarily outside the ordinary course of trade. The mere fact of abnormally low prices and profits is not enough to put sales outside of the ordinary course of trade, as Commerce examines all the circumstances particular to the sales in question. Cemex, 133 F.3d at 900 (quoting Murata, 17 CIT at 264, 820 F.Supp. at 607). Moreover, here, none of the other factors associated with sales outside the ordinary course of trade are present, as there were no sales involving: off quality merchandise; merchandise produced according to unusual specifications; merchandise sold pursuant to unusual terms of sale; or merchandise sold to an affiliated party at a non-arm's length price. 19 C.F.R. § 351.102(b)(35). Thus, Commerce's determination was reasonable.

Lastly, Appvion argues that Commerce's interpretation of the pricing data for KT 48 F20 (another grade of LWTP) is unsupported and irrational. Pl.'s Br. at 31. Appvion's argument, however, does nothing to change the fact that under a disaggregated analysis, Commerce did not find a dramatic price increase after the transshipment scheme ended. Pl.'s Confidential App. Price and Profitability Analysis at Fig. 2.

**2. Adverse Facts Available**

Commerce may apply AFA where "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). "Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Commerce enjoys broad discretion when considering whether to apply AFA. See PAM, S.p.A. v. United States, 582 F.3d 1336, 1339-40 (Fed. Cir. 2009). This discretion does not require that Commerce show that an importer cooperated to the best of its ability every time it determines that AFA should not be applied. AK Steel Corp. v. United States, 28 CIT 1408, 1417, 346 F.Supp.2d 1348, 1355 (2004). Cooperating to the best of its ability means that the company must: take reasonable steps to keep and maintain full and complete records documenting the

information that a reasonable importer should anticipate being called upon to produce; have familiarity with all the records it maintains; and conduct prompt, careful, and comprehensive investigations of all relevant records. Nippon, 337 F.3d at 1382.

In AR3, Commerce found that Koehler failed to cooperate to the best of its ability and significantly impeded the review by not fully reporting its home market sales. IDM for AR3 at 9. Consequently, Commerce applied AFA in that review. Id. By comparison, in AR4, Koehler fully disclosed its home market sales information including the transshipment scheme, and Commerce confirmed this through verification. IDM for AR4, at 15. Appvion, however, contends that the transshipment scheme affected Koehler's entire accounting system with fraud such that any verification by Commerce cannot be trusted. Pl.'s Br. 40-41.

Appvion heavily relies on the Court's holding in Tianjin Magnesium Int'l Co., Ltd. v. United States, 844 F. Supp. 2d 1342, 1347 (2012), in support of its contention. The Court takes issue with Appvion's contention. In Tianjin, this Court concluded that the application of AFA was warranted where the respondent submitted false documents two months after their falsity had been established in a failed verification. Id. The instant case is distinguishable, because, here, Koehler fully disclosed its home market sales information including the transshipment scheme, and Commerce confirmed this through verification. Pl.'s Confidential App.,

Case 1:14-cv-00143-NT   Document 56   Filed 09/17/15   Page 16 of 16
Court No. 14-00143                                                    Page 16

Koehler Section A Response at 15-17, 24, and Ex. A-7. Furthermore, Koehler put forth maximum effort to provide Commerce with full and complete answers to the request for information. See Nippon, 337 F.3d at 1382. Moreover, there is no indication that Koehler was unfamiliar with its records or that it failed to maintain full and complete records or that it did not conduct a prompt, careful, and comprehensive investigation. See id. The court finds that Commerce's decision not to apply AFA here was reasonable.

### 3. Conclusion

For the foregoing reasons, Plaintiff's Motion for Judgment on the Agency Record is denied and Commerce's Final Results are affirmed. Judgment will be entered accordingly.


                                            /s/ Nicholas Tsoucalas
                                         **Nicholas Tsoucalas**
                                            **Senior Judge**

Dated:  September 17, 2015
        **New York, New York**